1
2
3
4
5
6
7
8    # UNITED STATES DISTRICT COURT

9    EASTERN DISTRICT OF CALIFORNIA

10

11   HEATHER ELIZABETH GUNTER,                    Case No. 1:20-cv-00433-SKO

            Plaintiff,

12        v.                                      ORDER ON PLAINTIFF'S SOCIAL
                                                   SECURITY COMPLAINT
13   ANDREW SAUL,
14   Commissioner of Social Security,

15          Defendant.                            (Doc. 1)

16

17   _____/

18

19
                      **I.      INTRODUCTION**
20

21        Plaintiff Heather Elizabeth Gunter ("Plaintiff") seeks judicial review of a final decision of

22   the Commissioner of Social Security (the "Commissioner" or "Defendant") denying her

23   application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act

24   (the "Act"), 42 U.S.C. § 1383(c).  (Doc. 1.)  The matter is currently before the Court on the

25   parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto,

26   United States Magistrate Judge.[1]

27   ///

28
     _____
     [1] The parties have consented to the jurisdiction of the U.S. Magistrate Judge.  (Docs. 10, 11.)

## II.    BACKGROUND

Plaintiff protectively filed her SSI application on July 8, 2016, alleging disability as of June 30, 2016, due to bipolar disorder with stress and anxiety. (Administrative Record ("AR") 31, 64, 65, 72, 73, 83, 172, 176, 203, 205.) Plaintiff was born on August 11, 1988, has a high school education, and previously worked as a certified nursing assistant. (AR 31, 37, 47, 64, 72, 172, 203, 205.)

**A.    Relevant Evidence of Record[2]**

**1.    Medical Evidence**

In June 2016, Plaintiff presented for mental health evaluation and treatment. (AR 235–37.) She reported a history of bipolar disorder beginning in high school. (AR 235.) She complained of side effects from medication, which is why she had not been taking it. (AR 235.) Plaintiff reported having a "down phase" for last several weeks. (AR 235.) She and her husband had just moved to her grandmother's home, where she was not allowed to bring her 14 pet rabbits. (AR 235.) Plaintiff reported recently losing her certified nursing assistant job due to "attendance issues." (AR 235.) She reported she was trying to get pregnant. (AR 235.)

Plaintiff complained of depressed mood with crying, increased sleep, decreased appetite, and fluctuating weight. (AR 235.) She denied suicidal or homicidal thoughts, but reported seeing "shadows" at the corners of her eyes. (AR 235.) Plaintiff reported carrying a knife "so people would keep a distance." (AR 235.) No overt psychosis was reported, but Plaintiff indicated she had sporadic panic attacks. (AR 235.) She denied agoraphobia, history of trauma, and post-traumatic stress disorder (PTSD). (AR 235.) According to Plaintiff, when she was in the "super hyper" phase, her mood would be elevated, she could be energetic, she spent more money, and her sleep was normal. (AR 235.) She reported "trip[ping]" over her words, and indicated the phase would last for a couple of days. (AR 235.) Plaintiff reported a history of drug and alcohol abuse, but quit all substances in 2007. (AR 236.)

Upon mental status examination, Plaintiff was pleasant and cooperative, with normal

---

[2] Because the parties are familiar with the medical evidence, it is summarized here only to the extent relevant to the contested issues.

speech. (AR 236.) She had a depressed mood and congruent affect. (AR 236.) Plaintiff's thought process was logical and her thought content "goal directed." (AR 236.) She was fully oriented with normal attention, concentration, and memory. (AR 236.) Plaintiff's fund of knowledge, insight, and judgment were all "good." (AR 236.) She was assessed with bipolar 2 disorder, with depressed episode with anxious stress. (AR 237.) It was noted that Plaintiff had a "good response" to antipsychotics in the past, but experienced weight gain as a side effect. (AR 237.) She was prescribed a trial of Risperdal and declined therapy. (AR 237.)

Plaintiff presented for a follow up appointment in July 2016. (AR 232–34.) She reported taking Risperdal as ordered, but it resulted in "significant sedation," causing her to sleep until noon. (AR 232.) Plaintiff also gained a significant amount of weight. (AR 232.) She reported no more hyper moods or "trip[ping] on her words," but she still has significant depression, with lack of motivation, low energy, and difficulty concentrating. (AR 232.) Plaintiff denied any suicidal or homicidal thoughts, and there was no indication of psychosis. (AR 232.) She reported having anxiety. (AR 232.)

Plaintiff's mental status examination results were the same as before, except that her mood was found to be both depressed and anxious. (AR 233.) Risperdal was discontinued due to side effects of sedation and weight gain, and Plaintiff was prescribed Lamictal instead. (AR 233.) She declined to participate in bipolar therapy groups. (AR 233.)

In August 2016, Plaintiff returned for a follow-up appointment for her bipolar 2 disorder with anxiety. (AR 283.) She reported trying Lamictal for two weeks, but ceased taking it due to irritability. (AR 283.) Plaintiff stated that in July all her male pet rabbits died, and she suspected they were poisoned. (AR 283.) The remaining rabbits were relocated to a friend's home. (AR 283.) She was also "yelled at by her relatives." (AR 283.) Plaintiff complained of depressed feelings, low appetite, sleep fluctuation, weight loss, and anxiety. (AR 283.) She denied suicidal/homicidal intent or plan, psychosis, and manic symptoms. (AR 283.) Plaintiff reported "lik[ing] antipsychotics better." (AR 283.) Plaintiff's mental status examination results were the same as before. (AR 283–84.) She was given a trial of Geodon and referred to therapy. (AR 284.)

Plaintiff reported doing "slightly better" on Geodon in October 2016. (AR 280.) Her mood

was indicated as "depressed," but "better than last time." (AR 281.) Plaintiff's dosage of medication was increased. (AR 281.)

In January 2017, Plaintiff voluntarily presented to the emergency department for a psychiatric evaluation due to depression and anxiety (AR 273–77.) She reported recently being evicted from her husband's grandmother's home, and stated she and husband have been living in their car for the past two weeks. (AR 274.) Plaintiff noted that her situation has been stressful because family members (from whom she has offers of housing) and homeless shelters are making her choose between housing and her 15 pet rats, which she refuses to give up. (AR 274, 276.) She reported that she had not been taking her Geodon for over a month. (AR 271, 274.) A few days later, Plaintiff reported feeling better now that had found a place to stay (renting a room from a friend). (AR 271.) She was assessed with bipolar 2 disorder, depressed episode with anxious stress, along with a personality disorder, and was instructed to resume Geodon. (AR 272.)

Plaintiff presented for a follow-up appointment in March 2017 for her bipolar 2 disorder with anxiety. (AR 346–49.) She reported not having taken Geodon for over two months, even though she was "doing better," specifically with her anxiety, when she was taking it. (AR 346.) Plaintiff stated the medication caused her to sleep more, which upset the friend from whom Plaintiff was renting a room. (AR 346.) Plaintiff and her friend were having "renting issues," which resulted in the police visiting "several times." (AR 346.) She reported that her husband is still unemployed and now she has 24 rats, which, according to her husband, help "calm her down." (AR 346.) Plaintiff complained of depressed mood, low energy, low appetite and trouble sleeping. (AR 346.) She denied any manic symptoms, suicidal/homicidal thoughts, or psychosis. (AR 346.) Plaintiff's mental status examination results were unchanged from prior examinations. (AR 347–48.) She was referred to psychiatric case management for further treatment. (AR 348–51.)

In May 2017, Plaintiff presented to the emergency department complaining of nausea and vomiting, and had a positive pregnancy test. (AR 340–42.) She returned a few weeks later for medication management, and reported that she continues to deal with "social issues." (AR 321–23.) Plaintiff continued to be inconsistent with her Geodon, but saw an individual therapist and attends group sessions at the Madera County Mental Health clinic. (AR 321.) She reported feeling

better now that she is pregnant, and believes that her mood symptoms have been related to the situations at home.  (AR 321.)  Given her pregnancy and her mild mood symptoms, it was recommended that she cease taking medication for the time being.  (AR 323.)

After failing to appear at an earlier appointment in January 2018 (AR 313–14), Plaintiff presented to psychiatrist Caaithiry Jayaraman, M.D., for a medication management follow-up appointment.  (AR 315–17.)  She reported having a baby over a month ago and being under "increased stress recently due to her and her husband living separately due to financial and family stressors."  (AR 315.)  Plaintiff complained of mood swings with depressed and irritable mood.  (AR 315.)  Her appetite was increased, with fluctuating energy and low concentration.  (AR 315.)  Plaintiff requested a medication trial.  (AR 315.)  She denied any current active suicidal ideations, homicidal ideations, auditory hallucinations, visual hallucinations, or paranoid thoughts.  (AR 315.)  Upon examination, Dr. Jayaraman found Plaintiff calm, relaxed, and cooperative, with good eye contact.  (AR 316.)  Her thought processes were logical, linear, and goal directed, with normal thought content.  (AR 316.)  Dr. Jayaraman noted Plaintiff's mood was depressed with a flat affect.  (AR 316.)  Her insight & judgment appeared "relatively fair."  (AR 316.)  Dr. Jayaraman prescribed a trial of Lamictal.  (AR 316.)

In February 2018, Plaintiff reported to Dr. Jayaraman that Lamictal was "worsening her mood swings" and requested a medication change.  (AR 318.)  Her mental status examination was the same as before, except that her mood was indicated as "irritable."  (AR 319.)  Dr. Jayaraman prescribed Abilify for Plaintiff's symptoms.  (AR 319.)

Plaintiff presented for a mental status examination with Dr. Jayaraman in March 2018, which was normal, with euthymic mood, fair memory, and good insight and judgment.  (AR 304.)  She again failed to appear at her appointment in April 2018.  (AR 312.)

In September 2018, Dr. Jayaraman noted Plaintiff's prior diagnoses of unspecified bipolar disorder, generalized anxiety disorder, and methamphetamine abuse.  (AR 491.)  Plaintiff reported that she has been using methamphetamine with her husband over the past several months at their home, while their infant was in the house.  (AR 491.)  She stated that the baby was living with her stepmother and father for the past few weeks due to her drug use.  (AR 491.)

1    Plaintiff declined substance abuse treatment.  (AR 491.)  She stated she is interested in

2  continuing psychotherapy sessions and wants to re-start psychiatric medications for her mood

3  swings and anxiety.  (AR 492.)  She reports "up and down" mood with depression and irritability.

4  (AR 492.)  Plaintiff stated that she has a good appetite, but low energy.  (AR 492.)  She has racing

5  thoughts and higher anxiety levels due to "ongoing family stressors."  (AR 492.)  Plaintiff requested

6  Seroquel and denied thoughts to harm herself, her child or anyone else.  (AR 492.)  She also denied

7  active suicidal ideations or homicidal ideations.  (AR 492.)  Her mental status examination was

8  normal, except that her insight and judgment were indicated as "relatively fair" and her mood

9  irritable.  (AR 492.)

10         **2.     Opinion Evidence**

11       In August 2016, Mary Lewis, Psy. D., performed a mental status evaluation of Plaintiff.

12  (AR 263–68.)  Plaintiff complained that she could not work because she has "problems keeping a

13  job."  (AR 263–64.)  She reported smoking cigarettes since age 15, consuming alcohol, and using

14  marijuana.  (AR 264.)  She presented with good eye contact and hygiene and with a cooperative

15  and pleasant attitude.  (AR 265.)  Plaintiff had no obvious expressive or receptive language deficits.

16  (AR 265.)  She reported that she enjoys "building stuff," such as a rat cage for her pet rats.  (AR

17  267.)  She reported caring for her personal needs and performing chores such as vacuuming,

18  washing dishes, cooking, and laundry.  (AR 267.)

19       Dr. Lewis observed Plaintiff's stream of mental activity was within normal limits, she was

20  oriented in all spheres, and her stream of consciousness was linear, logical, coherent, and goal

21  directed.  (AR 265.)  Her mood was euthymic and his affect appropriate.  (AR 265.)  Dr. Lewis

22  noted that Plaintiff could name the current and three previous United States presidents, identify

23  how many eggs were in a dozen, and explain why food is placed in a refrigerator.  (AR 265.)

24  Plaintiff was correctly able to recall four digits forwards and backwards on digit span testing, and

25  solve basic arithmetic calculations.  (Doc. 265.)  She could state the similarities of related items

26  and recalled three of three items after a five-minute delay.  (Doc. 266).  Dr. Lewis found Plaintiff's

27  judgment within normal limits.  (AR 266.)  She diagnosed Plaintiff with nicotine dependence, and

28  opined that Plaintiff had no impairment in her abilities to perform basic work activities.  (AR 267–

68.)

In September 2016, H.T. Unger, M.D., a State agency physician, reviewed the record and found that Plaintiff had no medically determinable mental impairments. (AR 68–69.) Upon reconsideration in February 2017, another State agency physician, Robert Liss, Ph.D., reviewed the record and opined that Plaintiff's depressive, bipolar and related disorders impairment was non-severe. (AR 78–79.)

In July 2017, Dr. Jayaraman opined that Plaintiff's ability to concentrate on her daily activities is affected by her mood swings. (AR 288.) She found that Plaintiff's mood disorder and anxiety disorder increased in some social situations. (AR 288.) Dr. Jayaraman further opined that Plaintiff's mood swings and anxiety also affect her attention and concentration with respect to task completion. (AR 288.) She stated Plaintiff "also needs to improve coping skills in continued psychotherapy to better deal with stressors better." (AR 288.)

**B.    Administrative Proceedings**

The Commissioner denied Plaintiff's application for benefits initially on September 22, 2016, and again on reconsideration on February 8, 2017. (AR 126, 83–87, 91–95.) Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (AR 98–100.)

On November 14, 2018, Plaintiff appeared with counsel and testified before an ALJ as to her alleged disabling conditions. (AR 46–57.) Plaintiff's father Roy Gunter and a vocational expert ("VE") also testified at the hearing. (AR 58–62.)

**1.    Plaintiff's Testimony**

Plaintiff testified that she lives with her husband, to whom she has been married for three years, and has been sober since August 2018. (AR 50, 60.) Their 10-month-old daughter has lived with Plaintiff's father and stepmother since that time. (AR 50.) According to Plaintiff, while on medication, she gets "anxious a lot," as well as "really angry or aggressive." (AR 51.) She stated she handles all of the primary chores of the household, but some chores are "problematic." (AR 51–52.)

Plaintiff stated she has " a hard time with interpersonal relationships" with coworkers, bosses, and authority figures (AR 53.) She gets anxious around large crowds and will avoid

crowded aisles at the grocery store.  (AR 54.)  Plaintiff has had angry outbursts where she has yelled and cursed at others.  (AR 55.)  She testified that her anxiety causes her to have difficulty breathing and causes a panic attack.  (AR 55.)  Plaintiff stated that her husband helps calm her down and that extreme violence triggers the attacks.  (AR 55.)

According to Plaintiff, she can focus on a movie or television show, but not for longer than 30 minutes.  (AR 56.)  She testified that she uses Facebook but not to communicate with family members because she "[doesn't] really get along with people."  (AR 57.)  Plaintiff could not recall whether she'd had an anxiety attack since August 2018.  (AR 58.)  She stated that her stepmother helps manage funds and pay bills.  (AR 55.)

### 2. Plaintiff's Father's Testimony

Plaintiff's father Roy Gunter testified that Plaintiff had at least three anxiety attacks since August 2018.  (AR 58.)  He stated that Plaintiff "can't focus on any task," "[n]othing gets done," and she doesn't "follow through on her appointments."  (AR 58.)  According to Mr. Gunter, Plaintiff yells at him when he gets "matter of fact" with her, and she does not interact with people. (AR 59–60.)

### 3. Vocational Expert's Testimony

The ALJ asked the Vocational Expert ("VE") to consider a person of Plaintiff's age and education, and work experience, and that this person would have no exertional limitations and all postural activities could be performed on a frequent basis.  (AR 60–61.)  The person would have no more than an occasional ability to: understand, remember, and carry out complex and detailed job instructions; make judgments on complex and detailed work-related job assignments; or cope with the stress normally associated with semiskilled or skilled employment.  (AR 61.)  The person could have no more than occasional face-to-face interaction with the general public, coworkers, and supervisors.  (AR 61.)  The VE testified that such a person could perform work such as a housecleaner, Dictionary of Operational Titles ("DOT") code 323.687-018, heavy exertional level, with a specific vocational preparation (SVP) [3] of 2, for which there are approximately

---

[3] Specific vocational preparation, as defined in DOT, App. C, is the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.  DOT, Appendix C – Components of the Definition Trailer, 1991 WL 688702 (1991).  Jobs in

113,000 jobs in the national economy. (AR 61.) The VE further testified that such a person could perform unskilled work as a machine packager, DOT code 920.685-078, medium exertional level, and SVP 2, for which there are approximately 31,000 jobs, and could also perform work as a marker, DOT code 209.587-034, light exertional level and SVP 2, for which there are approximately 366,000 jobs in the nation. (AR 61.)

In a second hypothetical, the VE was asked by the ALJ to consider the same person as in the first hypothetical, but include the additional limitation that the person would not be able to maintain regular attendance at work or complete a normal workday or workweek. (AR 61.) The VE testified that no work would be available. (AR 61.) Plaintiff's counsel asked the VE to consider the person presented in the first hypothetical, but who would be off task 15% of the workday. (AR 61–62.) The VE responded that there would be no work such a person could perform. (AR 62.) In a fourth, last, hypothetical, Plaintiff's counsel asked the VE to consider the same person as in the first hypothetical, but include the additional limitations of no contact with the public and a requirement that their supervisor must redirect or correct the work activity of the individual 15% of the time. (AR 62.) The VE testified that there would be no work available. (AR 62.)

**C.     The ALJ's Decision**

In a decision dated February 5, 2019, the ALJ found that Plaintiff was not disabled. (AR 26–38.) The ALJ conducted the five-step disability analysis set forth in 20 C.F.R. § 416.920(a)(4). (AR 28–38.) The ALJ determined that Plaintiff had not engaged in substantial gainful activity since July 8, 2016, the application date (step one). (AR 28.) At step two, the ALJ found the following impairments severe: exogenous obesity; bipolar disorder, depressed episode with anxious stress; generalized anxiety disorder; personality disorder; and a history of methamphetamine dependence. (AR 28–29.) Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") (step three). (AR 29–30.)

---

the DOT are assigned SVP levels ranging from 1 (the lowest level – "short demonstration only") to 9 (the highest level – over 10 years of preparation). *Id*.

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[4] and applied the RFC assessment at steps four and five. *See* 20 C.F.R. § 416.920(a)(4) ("Before we go from step three to step four, we assess your residual functional capacity . . . . We use this residual functional capacity assessment at both step four and step five when we evaluate your claim at these steps."). The ALJ determined that Plaintiff had the RFC:

> to perform a wide range of work at all exertional levels but with the following non-exertional limitations: she could frequently balance, stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds. She can have no more than occasional face-to-face interaction with the general public, supervisors, and coworkers with occasional defined as no more than 1/3 of the workday with each work group. She cannot, more than occasionally, understand, remember, and apply information necessary to perform complex and detailed work tasks or make judgments on complex and detailed work related job assignments or cope with the stress normally associated with semi-skilled or skilled employment.

(AR 30.) Although the ALJ recognized that Plaintiff's impairments "could reasonably be expected to cause the alleged symptoms[,]" he rejected Plaintiff's subjective testimony as "not entirely consistent with the medical evidence and other evidence in the record . . . ." (AR 32.)

The ALJ determined that Plaintiff had no past relevant work (step 4), but was not disabled because, given her RFC, she could perform a significant number of other jobs in the local and national economies, specifically house cleaner, machine packager, and marker (step 5). (AR 37–38.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on December 18, 2019. (AR 6–17.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. § 416.1481.

///

///

---

[4] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule. TITLES II & XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, Social Security Ruling ("SSR") 96-8p (S.S.A. July 2, 1996). The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments. *Id.* "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

# III.    LEGAL STANDARD

## A.    Applicable Law

An individual is considered "disabled" for purposes of disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). However, "[a]n individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520); *see also* 20 C.F.R. § 416.920. The Ninth Circuit has provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity. If so, the claimant is not disabled. If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments. If not, the claimant is not disabled. If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1. If so, the claimant is automatically presumed disabled. If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing her past relevant work. If so, the claimant is not disabled. If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to perform any other substantial gainful activity in the national economy. If so, the claimant is not disabled. If not, the claimant is disabled.

*Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see, e.g.*, 20 C.F.R. § 416.920(a)(4) (providing the "five-step sequential evaluation process" for SSI claimants). "If a claimant is found to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520); 20 C.F.R. § 416.920.

"The claimant carries the initial burden of proving a disability in steps one through four of the analysis." *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989)).

"However, if a claimant establishes an inability to continue her past work, the burden shifts to the Commissioner in step five to show that the claimant can perform other substantial gainful work." *Id.* (citing *Swenson*, 876 F.2d at 687).

## B. Scope of Review

"This court may set aside the Commissioner's denial of [social security] benefits [only] when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett*, 180 F.3d at 1097 (citation omitted). "Substantial evidence . . . is 'more than a mere scintilla,'" and means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). *See also Ford v. Saul*, 950 F.3d 1141, 1154 (9th Cir. 2020).

"This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009). "The ALJ's findings will be upheld if supported by inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citation omitted). Additionally, "[t]he court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." *Id.*; *see, e.g.*, *Edlund*, 253 F.3d at 1156 ("If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner." (citations omitted)).

Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*, 143 F.3d 1240, 1243 (9th Cir. 1998)). "Rather, a court must 'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006)). Harmless error "exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir.

2006)). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

## IV.        DISCUSSION

Plaintiff contends there is no substantial evidence to support the ALJ's RFC assessment. (Doc. 18 at 8–11; Doc. 22 at 2–4.) He points out that "no medical professional assessed the impact of Plaintiff's diagnoses and symptoms on functionality," and that the ALJ should have "obtain[ed] an opinion from a treating or an examining source." (Doc. 18 at 9. *See also* Doc. 22 at 2.) Instead, according to Plaintiff, the ALJ relied on his lay interpretation of the medical evidence and erred in failing to develop the record further. (*See* Doc. 18 at 8, 9–10; Doc. 22 at 4.) Plaintiff contends that because the ALJ failed to develop the record, substantial evidence does not support the ALJ's RFC determination and the matter should be remanded for further administrative proceedings. (*See* Doc. 22 at 4.) Plaintiff further asserts that the ALJ erred in discounting her subjective symptom testimony and the testimony of her father. (*See* Doc. 18 at 9–10; Doc. 20 at 4–5.)

The Commissioner responds that Plaintiff failed to preserve the issue for appeal because her counsel told the ALJ at the hearing that the record was complete. (Doc. 21 at 11–12.) The Commissioner contends, alternatively, that no duty to develop the record arose because the ALJ considered all of the evidence in the record, which was neither ambiguous nor inadequate, in assessing Plaintiff's RFC. (*Id.* at 13–15.) The Commissioner maintains that the ALJ's RFC assessment was therefore based on substantial evidence and should be affirmed. (*Id.*) Finally, the Commissioner contends that the ALJ properly evaluated Plaintiff's subjective symptom statements, and that his discounting of Plaintiff's father's testimony was not erroneous. (*Id.* at 15–21.)

The Court addresses the parties' contentions below, and finds that reversal is not warranted.

### A.        Plaintiff's Challenge to the Record Does Not Constitute Reversible Error

#### 1.        The Issue Has Not Been Preserved

Preliminarily, as a rule, "when claimants are represented by counsel, they must raise all issues and evidence at their administrative hearings in order to preserve them on appeal." *Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999). Here, as the Commissioner points out, Plaintiff was represented by counsel at the administrative hearing (incidentally, the same counsel who represents

her before this Court) who expressly stated that the record was complete when asked by the ALJ. (AR 46 ("ALJ: Is the record complete?  ATTY: It is.  ALJ: Wonderful.").); *see Meanel*, 172 F.3d at 1115; *Howard v. Astrue*, 330 F. App'x 128, 130 (9th Cir. 2009) (issue waived because attorney had opportunity to raise it at administrative hearing but did not do so); *Ryan Patrick A. v. Berryhill*, No. EDCV 17-2526-JPR, 2019 WL 1383800, at *7 (C.D. Cal. Mar. 27, 2019) (issue forfeited where the plaintiff was represented by counsel at the administrative hearing, who twice stated that the record was complete); *Valdez v. Berryhill*, Case No. SA CV 16-0980 JCG, 2018 WL 317799, at *1 (C.D. Cal. Jan. 5, 2018) (issue not properly preserved where the plaintiff was represented by counsel at the administrative hearing and specifically stated he had "no objection" to the record when asked by the ALJ).  Accordingly, the issue is not properly preserved for appeal. *See Smith v. Saul*, No. 1:19-cv-01085-SKO, 2020 WL 6305830, at *7 (E.D. Cal. Oct. 28, 2020).

### 2.     The ALJ Had No Duty to Develop the Record

Even if the issue had not been forfeited, Plaintiff has not shown that it warrants remand. "An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Ford,* 950 F.3d at 1156; *Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001).  Plaintiff has not demonstrated the record was ambiguous or inadequate to allow for proper evaluation.  The ALJ summarized record evidence spanning 2016 through 2018, and found with the support of that record that Plaintiff had not established she was disabled.  (AR 31–37.)  Notably, Plaintiff failed to submit any medical opinions from a treating or examining physician as to any disabling functional limitations.

Plaintiff's treating psychiatrist Dr. Jayaraman proffered an opinion about the effects of Plaintiff's mood swings and anxiety (AR 288), but the ALJ found, appropriately, that the opinion was too vague to be given more than "some weight" (AR 36).  *See Barnes v. Colvin*, No. 6:14-CV-01906-HZ, 2015 WL 8160669, at *10 (D. Or. Dec. 7, 2015) (finding ALJ did not err in giving examining physician's opinion "some weight" where "some of [his] conclusions were vague.").  *See also Ford*, 950 F.3d at 1156 ("Here, the ALJ found that Dr. Zipperman's descriptions of Ford's ability to perform in the workplace as 'limited' or 'fair' were not useful because they failed to specify Ford's functional limits.    Therefore, the ALJ could reasonably conclude these

characterizations were inadequate for determining RFC."); *Meanel*, 172 F.3d at 1114 ("Dr. Manos'

mere statement that Meanel experienced some diminution in her concentration skills falls short of

an informed opinion that Meanel's pain and diminished concentration skills would significantly

interfere with her ability to work . . . .").

Because it is Plaintiff's burden to present evidence of disability, the mere absence of a

report from a treating or examining physician does not, contrary to Plaintiff's assertion, give rise

to a duty to develop the record; instead, that duty is triggered only where there is an inadequacy or

ambiguity. *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005); *Alvarez v. Astrue*, No. 1:08-

cv-01205-SMS, 2009 WL 2500492, at *10 (E.D. Cal. Aug. 14, 2009) (finding absence of report

from treating physician did not give rise to a duty to develop the record where record contained

opinions of the State agency physicians and plaintiff's complete treatment records); *see also* 42

U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he

furnishes such medical and other evidence of the existence thereof as the Commissioner of Social

Security may require."); 20 C.F.R. § 416.920(a) ("[Y]ou have to prove to us that you are  . . .

disabled . . . ."). The record contained Plaintiff's complete treatment records, as counsel conceded,

and no missing records or inconsistencies were noted. *See Findley v. Saul*, No. 1:18-CV-00341-

BAM, 2019 WL 4072364, at *6 (E.D. Cal. Aug. 29, 2019) (finding the ALJ was not obligated to

further develop the record where counsel stated at the hearing that the record was complete). *See*

*also Randolph v. Saul*, 2:18-cv-00555-CLB, 2020 WL 504667, at *8 (D. Nev. Jan. 31, 2020)

(same). In the absence of any inadequacy or ambiguity in the record, which Plaintiff has not shown,

the ALJ had no duty to develop it further.

### 3. The ALJ Did Not Err in Formulating Plaintiff's RFC

An RFC "is the most [one] can still do despite [his or her] limitations" and it is "based on

all the relevant evidence in [one's] case record," rather than a single medical opinion or piece of

evidence. 20 C.F.R. § 416.945(a)(1); *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001) ("It

is clear that it is the responsibility of the ALJ, not the claimant's physician, to determine residual

functional capacity."). Further, an ALJ's RFC determination need not precisely reflect any

particular physician's assessment. *See, e.g., Turner v. Comm'r Soc. Sec. Admin.*, 613 F.3d 1217,

1222-23 (9th Cir. 2010) (the ALJ properly incorporated physician's observations in the RFC determination while, at the same time, rejecting the implication that plaintiff was unable to "perform simple, repetitive tasks in an environment without public contact or background activity").

In criticizing the ALJ's failure to develop the record—which the Court has already rejected—Plaintiff contends that the RFC was the result of the ALJ improperly imposing his own lay interpretation of the medical evidence. (*See* Doc. 18 at 8, 9–10; Doc. 22 at 4.) This argument is unavailing.

The nature of the ALJ's responsibility is to interpret the evidence of record, including medical evidence. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). Such a responsibility does not result in the ALJ committing legal error when he assesses an RFC that is consistent with the record. *See Mills v. Comm'r of Soc. Sec*., No. 2:13-CV-0899-KJN, 2014 WL 4195012, at *4 (E.D. Cal. Aug. 22, 2014) ("[I]t is the ALJ's responsibility to formulate an RFC that is based on the record as a whole, and thus the RFC need not exactly match the opinion or findings of any particular medical source.") (citing *Magallanes v. Bowen*, 881 F.2d 747, 753 (9th Cir. 1989)).

According to the record, the only expert medical opinions regarding Plaintiff's mental impairments are those of Dr. Jayaraman (discussed above), consultative examiner Dr. Lewis, and State agency physicians Drs. Unger and Liss. (AR 36–37.) The ALJ considered these opinions in the content of the longitudinal record and assigned Dr. Lewis's opinion "no weight," finding it "inconsistent with the medical record that showed severe mental impairments and significant mental limitations. " (AR 36.) "Some weight" was given to the opinions of the State agency physicians because "evidence available at the hearing showed the claimant was more limited than previously determined." (AR 37.) The ALJ, as he is charged to do, then considered those opinions in light of the other evidence of record, such as Plaintiff's history of bipolar disorder (AR 235, 237, 272, 491), her diagnoses of personality disorder and generalized anxiety disorder (AR 272, 491), and mental status examinations results showing depressed and irritable mood with anxiety (AR

233, 236, 273–77, 281, 283–84, 316, 319, 347–48, 492), and formulated Plaintiff's RFC.[5] *See, e.g., Mills,* 2014 WL 4195012, at *4 (finding argument that the ALJ was improperly attempting to "play doctor" lacked merit where the ALJ "carefully analyzed the various medical opinions, treatment records, and plaintiff's own testimony in formulating an RFC."). *See also* 20 C.F.R. § 416.927(d)(2) ("the final responsibility for deciding [RFC] is reserved to the Commissioner), § 416.945(a)(1) ("We will assess your residual functional capacity based on all the relevant evidence in your case record.").

By contrast, in the cases on which Plaintiff relies, (Doc. 18 at 9), the ALJ considered "new" evidence subsequent to a medical opinion, made an "independent evaluation of the diagnosed impairments on plaintiff's ability to work on a function-by-function basis" based on that subsequent evidence, and "found the effects of any such impairments negligible." *Molina v. Berryhill*, No. 2:17-CV-01991-CKD, 2018 WL 6421287, at *4 (E.D. Cal. Dec. 6, 2018). *See Mack v. Saul,* No. 1:18-cv-01287-DAD-BAM, 2020 WL 2731032, at *2 (E.D. Cal. May 26, 2020); *Goodman v. Berryhill*, No. 2:17-CV-01228-CKD, 2019 WL 79016, at *7 (E.D. Cal. Jan. 2, 2019). Here, there is no new evidence at issue, and, instead of "negligible" impairments, the ALJ ultimately formulated a more restrictive RFC that included mental limitations, where none were found by the opining physicians. (*Compare* AR 30 *with* AR 68–69, 78–79, 267–68.) Plaintiff also fails to specify what additional, specific functional limitations the record might establish that were not accounted for in the ALJ's RFC assessment.

Nor is this a situation where all of the opinion evidence in the record has been wholly discounted, resulting in an RFC determination apparently based solely on treatment notes and the plaintiff's testimony. *Cf. Vasquez v. Comm'r of Soc. Sec.*, No. 1:18-CV-01042-EPG, 2019 WL 3714565, at *4 (E.D. Cal. Aug. 7, 2019); *Shipp v. Colvin*, No. CV 13-9468 JC, 2014 WL 4829035 (C.D. Cal., Sept. 26, 2014). In this case the ALJ evaluated the medical evidence as well the opinions of consultative examiner Dr. Lewis, treating physician Dr. Jayaraman, and the State agency physicians Drs. Unger and Liss. Contrary to Plaintiff's suggestion, the ALJ did <u>not</u> reject

---

[5] The ALJ's RFC assessment is also based on consideration of the subjective complaint testimony, which, as set forth more fully below, the ALJ properly discredited.

the opinions of Drs. Jayaraman, Unger, and Liss outright, but instead gave them "some weight," and found that they, in consideration with the medical record, supported a more restrictive RFC than opined by Dr. Lewis. To the extent Plaintiff is advocating for an alternative interpretation of the evidence in the record, the Court will not second guess the ALJ's reasonable interpretation, even if such evidence could give rise to inferences more favorable to Plaintiff. *See Molina*, 674 F.3d at 1110.

In sum, the Court finds that substantial evidence supports the ALJ's conclusions regarding the impact of Plaintiff's impairments on the RFC. Plaintiff may disagree with the RFC, but the Court must nevertheless uphold the ALJ's determination because it is a rational interpretation of the evidence. *See Ford*, 950 F.3d at 1159 ("Our review of an ALJ's fact-finding for substantial evidence is deferential"); *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).

**B.      The ALJ Properly Found Plaintiff Less Than Fully Credible**

### 1.      Legal Standard

In evaluating the credibility of a claimant's testimony regarding subjective pain, an ALJ must engage in a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment that could reasonably be expected to produce the pain or other symptoms alleged. *Id*. The claimant is not required to show that his impairment "could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom." *Id*. (quoting *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007)). If the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if he gives "specific, clear and convincing reasons" for the rejection.[6] *Id*. As the Ninth Circuit has explained:

> The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or

---

[6] The Court rejects the Commissioner's contention that a lesser standard of review applies. (*See* Doc. 21 at 18 n.9.)

inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. If the ALJ's finding is supported by substantial evidence, the court may not engage in second-guessing.

*Tommasetti*, 533 F.3d at 1039 (citations and internal quotation marks omitted); *see also Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1226–27 (9th Cir. 2009). Other factors the ALJ may consider include a claimant's work record and testimony from physicians and third parties concerning the nature, severity, and effect of the symptoms of which he complains. *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

The clear and convincing standard is "not an easy requirement to meet," as it is "'the most demanding required in Social Security cases.'" *Garrison v. Colvin*, 759 F.3d 995, 1015 (9th Cir. 2014) (quoting *Moore v. Comm'r of Social Sec. Admin.*, 278 F.3d 920, 924 (9th Cir. 2002)). General findings are not enough to satisfy this standard; the ALJ "'must identify what testimony is not credible and what evidence undermines the claimant's complaints.'" *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014) (quoting *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1995)).

### 2. Analysis

As noted above, the ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (AR 32.) The ALJ also found that "[Plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (AR 32.) Since the ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," the only remaining issue is whether the ALJ provided "specific, clear and convincing reasons" for Plaintiff's adverse credibility finding. *See Vasquez*, 572 F.3d at 591.

Here, the ALJ found that the objective findings and other evidence of record was "inconsistent" with Plaintiff's allegations. (AR 32, 35.) Had that been the end of the discussion, Plaintiff's argument that the ALJ erred by "fail[ing] to identify any clear or convincing reason for discounting Plaintiff's alleged symptoms" (Doc. 18 at 13) might have merit. However, the ALJ continued his analysis, explaining that Plaintiff's "use of medications did not suggest the presence of an impairment that was more limiting than found in this decision," that the "record reflected a

lack of pursuit of mental health treatment despite allegations of disabling bipolar symptoms," that "clinical findings similarly failed to support the alleged severity of symptoms and degree of limitation," and that Plaintiff "was rarely in compliance with treatment recommendations of medication and psychotherapy." (AR 34–35.)

As to the last reason given for discrediting Plaintiff's subjective symptom testimony, the ALJ noted that in 2016 Plaintiff was recommended to participate in therapy on two occasions, yet declined. (AR 33, 233, 237.) Plaintiff also declined substance abuse treatment. (AR 35, 491.) As the ALJ observed, Plaintiff began seeing a therapist in 2018, but missed several appointments. (AR 35, 304, 312–14.) With respect to medication, Plaintiff reported not following her prescribed medication regimen to her treatment providers on multiple occasions. (AR 235, 271, 274, 283, 321, 346.)

In evaluating a claimant's claimed symptoms, an ALJ may consider a claimant's failure to follow a prescribed course of treatment when weighing a claimant's credibility. *See Tommasetti*, 533 F.3d at 1039–40; *Johnson v. Shalala*, 60 F.3d 1482, 1434 (9th Cir. 1995). In so doing, however, an ALJ must consider a claimant's explanation for failing to undergo the recommended treatment. *See Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996). As the Ninth Circuit explained in *Fair v. Bowen*, it is the claimant's burden to adequately explain his or her failure to follow a prescribed course of treatment. 885 F.2d at 603 (claimant's failure to explain failure to seek treatment or follow a prescribed course of treatment can "cast doubt" on the sincerity of their testimony); *see also Smolen*, 80 F.3d at 1293. An ALJ may discount a claimant's credibility due to an "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment." *Tommasetti*, 533 F.3d at 1039.

Here, Plaintiff's briefing does not explain her lack of compliance with treatment, except to note that "any apparent noncompliance with treatment is not necessarily evidence of a lack of severe symptoms." (Doc. 18 at 14.) Plaintiff therefore proffers no explanation for her failure to follow her prescribed course of treatment. As Plaintiff has not met her burden of adequately explaining her failure to follow her treatment regimen, *see Fair*, 885 F.2d at 603, and viewing the record as a whole, the Court finds that ALJ's conclusion that Plaintiff was non-compliant with her

doctors' recommended course of treatment is supported by substantial evidence.

The ALJ's determination that Plaintiff was non-compliant with treatment is a clear and convincing reason for discounting Plaintiff's subjective symptom testimony. *Tommasetti*, 533 F.3d at 1039. *See Lee v. Colvin*, No. CV–12–00585–TUC–BPV, 2013 WL 3871416, \*7 (D. Ariz. July 26, 2013) ("Here, Plaintiff provides no reason for resisting treatment [for mental illness], and there is no medical evidence that Plaintiff's resistance was attributable to her mental impairment rather than her own personal preference. It was reasonable for the ALJ to conclude that the 'claimant's noncompliance does not support the alleged intensity and duration of her subjective complaints'"). As such, the Court need not address the other reasons given by the ALJ, enumerated above, for discounting Plaintiff's subjective symptom allegations. *See Carmickle v. Commissioner, SSA*, 533 F.3d 1155, 1162 (9th Cir. 2008).

## C.    The ALJ's Assignment of "Some Weight" to Plaintiff's Father's Lay Testimony is Harmless Error

### 1.    Legal Standard

Lay testimony as to a claimant's symptoms is competent evidence that an ALJ must take into account, unless he expressly determines to disregard such testimony and gives reasons germane to each witness for doing so. *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001); *Stout*, 454 F.3d at 1053; *see also* 20 C.F.R. § 416.913(d)(4). In rejecting lay witness testimony, the ALJ need only provide "arguably germane reasons" for dismissing the testimony, even if she does "not clearly link [her] determination to those reasons." *Lewis*, 236 F.3d at 512. An ALJ may reject lay witness testimony if it is inconsistent with the record. *See, e.g., id.* at 511–12 (rejecting lay witness testimony conflicting with the plaintiff's testimony and the medical record); *Bayliss*, 427 F.3d at 1218 (rejecting lay witness testimony conflicting with the medical record). The ALJ may "draw inferences logically flowing from the evidence." *Sample v. Schweiker*, 694 F.2d 639, 642 (9th Cir. 1982). Further, "[i]f the ALJ gives germane reasons for rejecting testimony by one witness, the ALJ need only point to those reasons when rejecting similar testimony by a different witness." *Molina*, 674 F.3d at 1114.

*///*

## 2. Analysis

Other than noting that it "did not warrant more [sic] the above-cited work related limitations" (AR 36), ALJ failed to give any reasons, germane or otherwise, for giving only "some weight" to Plaintiff's father Roy Gunter's testimony. This was error. *See Molina*, 674 F.3d at 1114 ("[U]nder our rule that lay witness testimony 'cannot be disregarded without comment,' the ALJ erred in failing to explain her reasons for disregarding the lay witness testimony, either individually or in the aggregate.") (citing *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996)). However, as in *Molina*, the error here is also harmless. *See Molina*, 674 F.3d at 1115 (finding the error in failing to explain reasons for disregarding lay testimony harmless). In *Molina*, the Ninth Circuit stated that where lay testimony does not describe any limitations not already described by the claimant, and the ALJ's well-supported reasons for rejecting the claimant's testimony apply equally well to the lay witness testimony, it would be inconsistent with the Court's prior harmless error precedent to deem the ALJ's failure to discuss the lay witness testimony to be prejudicial per se. *Molina*, 674 F.3d at 1117.

The Court notes the lay witness provided testimony similar to that of Plaintiff, *i.e.*, both Plaintiff and Mr. Gunter testified that Plaintiff was less functional due to anxiety and anger issues than found by the ALJ. (*Compare* AR 51, 55 (Plaintiff testified she experiences anxiety attacks, anger, and aggressiveness) *with* AR 58, 59 (Mr. Gunter testified Plaintiff experiences anxiety attacks and anger outbursts); *compare* AR 53–55 (Plaintiff testified that she cannot work due to difficulty with interpersonal relationships and her "attitude," which causes her to get into arguments and yell and curse in public) *with* AR 59–60 (Mr. Gunter testified Plaintiff "doesn't associate with people very well at all" and will yell and curse at him); *compare* AR 56 (Plaintiff testified she cannot focus on a 30-minute television show) *with* AR 58 (Mr. Gunter testified Plaintiff "can't focus on any task," "[n]othing gets done," and she doesn't "follow through on her appointments"; *compare* AR 54 (Plaintiff testified that she gets anxious around crowds and will avoid congested aisles at the grocery store) *with* AR 59 (Mr. Gunter testified that Plaintiff will bypass lines at the grocery store if there are lot of people in them); *compare* AR 55 (Plaintiff testified that her stepmom helps her and her husband manage their funds) with AR 59 (Mr. Gunter testified that he and his

22

wife primarily manage Plaintiff's funds).)

As previously discussed, the ALJ properly rejected Plaintiff's testimony about the severity of her limitations because her claims were undermined by her failure to follow her recommended treatment regimen. (*See* AR 36.) Like *Molina*, here, the lay testimony did not describe any limitations beyond those Plaintiff herself described, which the ALJ discussed at length and rejected based on a well-supported, clear and convincing reason. *Molina*, 674 F.3d at 1122. Accordingly, the error is harmless since it would not change the ultimate result. *See Stout*, 454 F.3d at 1055 (error harmless where it is non-prejudicial to claimant or irrelevant to the ALJ's ultimate disability conclusion).

## V. CONCLUSION AND ORDER

After consideration of Plaintiff's and the Commissioner's briefs and a thorough review of the record, the Court finds that the ALJ's decision is supported by substantial evidence and is therefore AFFIRMED. The Clerk of this Court is DIRECTED to enter judgment in favor of Defendant Andrew Saul, Commissioner of Social Security, and against Plaintiff.

IT IS SO ORDERED.

Dated:   **April 30, 2021**                    /s/ *Sheila K. Oberto*

UNITED STATES MAGISTRATE JUDGE